American Rolbal Corporation v. Commissioner.
American Rolbal Corp. v. Commissioner
Docket No. 11086.
United States Tax Court
T.C. Memo 1954-67; 1954 Tax Ct. Memo LEXIS 180; 13 T.C.M. (CCH) 540; T.C.M. (RIA) 54173; June 15, 1954, Filed *180 Petitioner corporation had a depreciable interest in machinery and equipment used in its manufacturing process after transfer of ownership from principal stockholder. Basis for depreciation determined. Part of deficiencies in 1942 and 1943 due to fraud and part of deficiency for 1943 also due to negligence. Court has no jurisdiction to abate or reduce interest on deficiencies. Gustave B. Garfield, Esq., for the petitioner. John J. Madden, Esq., and John J. O'Toole, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies and penalties for the years 1941, 1942 and 1943 in the following amounts: Income Tax
Deficiency
Penalty
Sec. 293(b)
Sec. 291(a)
1941
$ 3,114.22
1942
1,319.74
$ 659.87
1943
1,473.75
736.88
$ 73.69
Declared Value Excess Profits
Tax
Defic
Penalty
iency
Sec. 293(b)
Sec. 291(a)
1941
$ 2,921.73
1942
45,078.36
$ 22,539.18
1943
26,938.25
13,469.12
$1,346.91
Excess Profits Tax
Deficiency
Penalty
Sec. 293(b)
Sec. 291(a)
1941
$ 5,534.69
1942
237,319.76
$118,659.88
1943
141,737.79
70,868.89
$7,086.89
Total of deficiencies and penalties
$700,879.60
*182 These deficiencies result principally from the disallowance of certain deductions in the years in controversy. The most significant of these are the charges relating to machinery, tools, fixtures and other equipment used in the manufacture of petitioner's product. The resolution of this issue depends upon whether the machinery was owned by the petitioner and consequently depreciable by it, or whether the machinery was owned by its sole stockholder, Leo L. Lowy, and leased to petitioner. Part of the deficiencies and related penalties result from the disallowance of certain expense deductions which the Commissioner alleges were personal expenses of Lowy and fraudulently charged to petitioner. Part of the deficiencies and related penalties result from attributing to the petitioner certain income which was diverted to Lowy, allegedly with intent to evade taxes. Findings of Fact The petitioner, American Rolbal Corporation, having its principal place of business in Brooklyn, New York, was organized as a New York corporation in December, 1937. Leo L. Lowy was the sole stockholder and president of the petitioner during its entire existence. Leo L. Lowy was born in Hungary in 1889. *183 His father was a successful and wealthy business man. When Lowy was approximately 16, his father lent money to Professor August Riebe, a German citizen and a pioneer developer of the ball bearing and roller bearing, to help finance the construction of a factory to produce ball and roller bearings. Lowy's father planned that the investment would eventually give his sons, Leo and Emil, a share in the business. Professor Riebe built a factory called the Riebe Werke, in Berlin, and started to manufacture ball and roller bearings. In 1908, Leo Lowy and his brother went to Berlin to learn the business under the tutelage of Professor Riebe. In 1910, Lowy came to the United States, joining his brother who had preceded him here. The two were sales agents for the bearings produced by the Riebe Werke. They concentrated on the developing infant motorcar industry in this country as a market for Riebe's bearings. Lowy remained in this country during World War I. He returned to Germany after the war to reestablish contacts with Riebe and arrange for the renewal of shipments of bearings to this country. By this time, his father and his brother had died. The father's estate in Hungary was being *184 administered by Lowy's uncle, Dr. Julius Sereny, the family attorney. Riebe required additional financing to continue production of his bearings. Because of the extreme inflation in German currency after the war, Riebe appealed to Lowy for financing in a foreign currency. Lowy interceded with Sereny and in 1922 the sum of $36,000 was obtained from Lowy's father's estate. The amount which had been advanced to Riebe by Lowy's father before the latter's death is unknown, but Lowy claimed that by 1922 the amount due him by Riebe had reached $5,000,000. Lowy returned to the United States following the reestablishment of contact with Riebe and organized a New York corporation known as the Riebe Ball Bearing Company. The purpose of this corporation was to register the trade-mark "Riebe" in the United States. Lowy continued to act as sales agent in the United States for Riebe's bearings but he conducted this business as an individual and not through the New York corporation. In 1923, a New Jersey corporation, called Riebe Ball Bearing Company, was formed by Robert Reiner, Carl W. Stern and George Berger who were its sole stockholders. This corporation was formed to act as Riebe's sales *185 agent in the United States and during the period of that corporation's operating history - about one year - Lowy temporarily relinquished his franchise as Riebe's sales agent in this country and became an employee of the New Jersey corporation. In 1924, Reiner, Stern and Berger sold their stock in the corporation to Lowy for $5,000 and two rare paintings of an unknown value. Lowy also assumed some obligations on behalf of the corporation for bearings which it had imported from Riebe but had not paid for. Following this transaction, Lowy resumed as sales agent for Riebe (Germany) in his individual capacity. In 1927, Professor Riebe sold his German interests to the SKF cartel. The proceeds of this transaction furnished Riebe with the means of repaying Lowy the funds which his father had invested in Riebe Werke. Lowy decided to build a bearing factory in the United States with the money he would receive from Riebe. He opened a small experimental shop in New York City and began to design, build and purchase machinery and other equipment for his projected factory. A large number of the units designed and built were dies and jigs especially adapted to the manufacture of bearings. Through *186 an acquaintance with banking connections, Lowy was able periodically to have transferred various amounts of the money owed him by Riebe and the money so received during 1927 through 1929, minus his living expenses, was used to purchase machinery and related equipment. Also, some of the machinery and equipment was paid for by funds of the Riebe Ball Bearing Company of New Jersey. The machinery was stored in various warehouses in the vicinity of New York City and Newark, N.J., or at Lowy's small shop. Simultaneously, Lowy was selling bearings obtained from German sources. In April, 1930, Lowy formed a Delaware corporation called Tapered Roller Bearing Co., Inc., to manufacture bearings with the equipment he had assembled in the previous two years. Lowy transferred to that corporation part of the machinery and tools which he had collected since 1927. The balance sheet of that corporation indicated that the machinery and equipment transferred had a value of $700,000 as of April, 1930. Tapered's tax return for the year 1930 showed gross sales of $32,680.08 and a loss of $91,637.35. In 1931, Tapered began to have serious financial difficulties and Lowy began to borrow to maintain the *187 operation. He obtained loans from Theodore Smith, who was president and principal stockholder of John Hassall, Inc., a manufacturer of nails located in Brooklyn, New York. In October, 1931, Lowry executed a chattel mortgage on behalf of Tapered to John Hassall, Inc., on account of an indebtedness of $57,250. The chattel mortgage covered machinery, Fixtures and equipment owned by Tapered with an indicated value of $707,237. Of this amount, machine tools, such as lathes and presses, accounted for $271,306 and jigs, dies and miscellaneous equipment accounted for $435,931. Tapered defaulted on the mortgage and Hassell foreclosed on May 3, 1932, and took possession of all the machinery and equipment and moved it to the Hassall factory in Brooklyn. With this foreclosure Tapered apparently disappeared. Approximately at the same time, May 7, 1932, Lowy's creditors, on account of his purchase of the stock and inventory of the Riebe Ball Bearing Company of New Jersey, petitioned him into personal bankruptcy. In this action, Lowy executed an oath on July 22, 1932, stating that he had no real or personal property except his clothes, and the stock of the Riebe Ball Bearing Company of New Jersey, *188 which was then declared by him to be worthless. At the time of this bankruptcy action, Lowy attempted to transfer the title to the machinery he still owned personally to the Riebe Ball Bearing Company of New Jersey. However, Riebe Ball Bearing had already forfeited its corporate charter for defaulting on New Jersey corporation taxes. Lowy was never discharged in bankruptcy. Sometime in 1933, the bankruptcy proceeding was closed, Lowy having satisfied or compromised the claims of his creditors. Following the foreclosure of the chattel mortgage on Tapered's equipment, and his personal bankruptcy action, Lowy was idle for the remainder of 1932 and the year 1933. In 1934, Lowy started in business again. He obtained permission from Hassall to use some of the machinery it had taken in foreclosure from the Tapered plant. Lowy set up this machinery in Hassall's factory at Clay and Oakland Streets in Brooklyn and began production. He manufactured and sold bearings in his individual name from this location during the period 1934 through 1937. On December 24, 1937, Lowy formed the petitioner, American Rolbal Corporation. He was the sole stockholder. At the time of its formation, American *189 Rolbal received from Lowy small tools and equipment which were entered on its books at a value of $5,700. The capital of $10,000 was entirely subscribed for by Lowy. From the beginning of 1938, American Rolbal carried on the business which had been initiated by Lowy as an individual in 1934. The machinery and equipment it used was the equipment which had been owned by Tapered and forclosed by Hassall, i.e., the same equipment and machinery which Lowy had used while operating in his individual capacity until the formation of American Rolbal. American Rolbal operated, as Lowy had, as an individual, from space in Hassall's factory. In September, 1940, Hassall required Lowy to move his Rolbal corporation because the space occupied by Lowy was needed. American Rolbal leased space at 68 Flushing Avenue and began moving its operation from Hassall's plant. Most of the machinery and equipment which Lowy owned personally and had stored in various warehouses in New York and New Jersey was moved to the new location. This was the same machinery which Lowy attempted to transfer to the Riebe Ball Bearing Company of New Jersey at the time of his personal bankruptcy action in 1932 when that corporation *190 was defunct. After this equipment and machinery was in place at the new location, with Hassall's permission, American Rolbal moved the equipment belonging to Hassall to the new address. All of the machinery and related equipment in the new location, whether owned by Lowy individually or by Hassall, was used by the petitioner, American Rolbal, in the manufacture of ball and roller bearings. In the early part of 1941, additional financing was necessary to continue the operations of American Rolbal. Lowy did not distinguish sharply between Rolbal's financial requirements. He was of the opinion that when his corporation needed money, it was exactly as though he needed money personally. His first attempts to obtain a loan for the corporation appear to be on his own note. Eventually, through the contacts he had with officials of the Leterstone Sales Corporation, Chicago, Illinois, which was Rolbal's principal sales outlet, Lowy was introduced to Seymour Bernstein, of the Merchants Acceptance Corporation, Chicago, Illinois. Lowy invited Bernstein to New York in March, 1941, for negotiations. Bernstein went to New York, and it was determined that Merchants Acceptance was willing to advance *191 $20,000 for four months to Rolbal in consideration of a "bonus" of $6,000, plus interest. Bernstein would lend at these rates only to Rolbal, a corporation, and not to Lowy, an individual, to avoid any question of usury. Bernstein's attorney examined the books and records of Rolbal to determine whether everything was in order to secure the prospective loan. He discovered that only $7,201 in machinery and equipment was in the name of Rolbal. Title to the bulk of the equipment and machinery at 68 Flushing Avenue used by Rolbal was still in Lowy's individual name or in Hassall's name. Before consummating the loan, Bernstein insisted that the corporation's records reflect a transfer of ownership to American Rolbal of all the machinery and equipment on the premises, title to which theretofore was in Lowy. Bernstein's attorney drew up the necessary documents to accomplish the transfer of title. These documents - two bills of sale conveying the aforesaid machinery and equipment on the premises at 68 Flushing Avenue to American Rolbal - were executed by Lowy on Marcy 13, 1941. Certain other adjustments were made in the corporate minute book to reflect the transfer of the machinery and *192 equipment to the corporation in exchange for its entire 100 shares of capital stock. Then, Lowy, on behalf of American Rolbal, executed a chattel mortgage in favor of the Merchants Acceptance Corporation covering all the machinery and equipment conveyed to the corporation by the two bills of sale. The mortgage was signed on the same day. The machinery and equipment transferred from Lowy in 1941 were never put on the books of Rolbal as an asset. The general ledger at this time showed "Plant and Equipment" account in the amount of $7,201. In September, 1941, when the loan was paid, the chattel mortgage was discharged and returned to Rolbal. The corporate records continued to reflect title to this machinery and equipment in Rolbal and, throughout the period here material, title to the machinery and equipment transferred on March 13, 1941, remained in Rolbal. Lowy claimed that the value of the equipment which he transferred to Rolbal in March, 1941, was $3,600,000. We find that the machinery and equipment transferred to Rolbal, together with any machinery and equipment theretofore acquired by it, had as of March 13, 1941, a basis for depreciation of not less than $1,000,000. In 1941, *193 Rolbal added capital equipment which cost $17,216.78; in 1942, $119,052.42, and in 1943, $73,976.74. Also, in 1943 Rolbal completed payments of $50,000 to Hassall and the latter released all claims it theretofore held to the equipment and machinery taken in foreclosure and this property was transferred to Rolbal. No deduction for depreciation was taken by petitioner on any of this machinery and equipment during the years in issue. The additions petitioner made during the period 1941 through 1943, including the $50,000 paid to Hassall, were expensed by the petitioner in the year of acquisition, instead of being capitalized. In determining petitioner's income for the period in issue, the respondent restored to income the items which had been expensed and in lieu thereof allowed deductions for depreciation in the amounts of $860.84 for 1941, $7,674.30 for 1942, and $24,686.20 for 1943. In petitioner's return for the year 1942, it was assumed that Lowy, as an individual, was still the owner of the machinery and equipment transferred by the bills of sale executed at the time of the loan on March 13, 1941. Consistent with this position, petitioner deducted $360,000 as an annual rent *194 for the use of this machinery and equipment for that year. This rental charge was based on Lowy's estimate that the machinery and equipment had a value of $3,600,000 and a 10-year life and, therefore, a 10 per cent annual rent would be reasonable. An accounts payable was set up on petitioner's books entitled "Machine Rental" in the amount of $360,000. A deduction was taken in this amount on petitioner's 1942 return filed March 15, 1943. The rental charge had not actually been paid to Lowy by that date, nor did Lowy have constructive receipt of it by that date. In preparation for filing the petitioner's 1943 return, an accountant examined Rolbal's books. His examination in early 1944 disclosed that the $360,000 rental for 1942 had not yet been paid to Lowy. He advised Lowy that since it had not been paid by March 15, 1943, it was not an allowable deduction for the year 1942, and an amended return for 1942 should be filed. No amended return was filed. On the 1943 return, $360,000 was again taken as a deduction for machinery rental. As in the instance of the rental for 1942, the rental for 1943 had not actually been paid by Lowy when the 1943 return was filed, nor had it been constructively *195 received by Lowy by that time. Rolbal had filed a certificate of corporate dissolution with the Secretary of State of New York on May 10, 1943. Publication of the notice was made in a newspsper of general circulation in New York. However, Rolbal continued to operate as a corporation and its 1943 return was filed as though the corporation had been in existence for the entire calendar year. In auditing the petitioner's return for the years 1942 and 1943, the respondent disallowed the machinery rental deductions for each year. Petitioner challenged the respondent's action in the first pleading in this proceeding before this Court by contending that, because Lowy owned all the stock of Rolbal and was in active control of the corporation, the machinery rental, set aside on the corporate books was available to him at all times. Petitioner contended that Lowy constructively received the rental in each of the years it had been taken as a deduction although he allowed the corporation to keep the money and use it as working capital to finance its expanding operations. Lowy did not report as income received in his 1942 and 1943 returns the so-called rental for the use of the machinery. Shortly *196 before the trial in this proceeding, the petitioner amended its pleadings and alleged that the machinery and equipment used in its operation in 1942 and 1943 belonged to petitioner as a result of the transfer of March 13, 1941, from Lowy to petitioner and that depreciation which had not been claimed on its returns was allowable at an annual rate of $360,000. It was on this theory that petitioner presented its case to this Court. During the years in issue, the books of American Rolbal were kept by a bookkeeper with occasional guidance and supervision from outside certified public accountants. Until 1943, Michael Liebowitz and his sister were the accountants. Following their departure in May, 1943, Rolbal did not retain another accountant until the early part of 1944 for assistance in preparation of the 1943 return. In entering transactions in the cash disbursements book, the check stubs and invoices were considered the primary sources of information. Invoices were frequently not available, however, and check stubs were relied on for information concerning most transactions. If the information on the stubs was ambiguous, the accountant would question Macklyn Weiss or Rosa Stammreich, *197 who were employees of Rolbal, or Lowy himself. In many cases, Lowy was the authority for the nature of the expenditure. The checks were not often compared with the stubs. In the following schedule, various checks drawn by Rolbal in 1942 and 1943 are listed. These checks were signed by Lowy and were paid to various merchants for the personal items indicated or were deposited in personal bank accounts and charged to Rolbal's various expense accounts as shown: 1942
Date
Check No.
Payee
Amount
Article
Account
Purchased
Charged
2/24
4387
B. Altman & Co.
$ 603.48
Unknown
Maintenance
3/ 2
4424
Geo. Harris, Inc.
415.00
Jewelry
Supplies
3/ 2
4513
J. Sloves
270.00
Tea set
Supplies
3/ 2
4995
J. Sloves
278.00
Dining room
Supplies
silver set
3/24
4609
C. P. Paul
1,212.00
Piano
Maintenance
5/25
4922
Helen Weiss
500.00
Maintenance
6/27
5130
W. & J. Sloane
28.28
Unknown
General
Expense
7/ 9
5225
Ethel Weiss
100.00
Mahogany desk
Maintenance
8/ 4
5511
H. Sacks & Sons
485.35
Breakfront
Maintenance
11/21
5485
H. Sacks & Sons
127.05
Furniture
Factory
Supplies
10/ 1
1051
Zinn's Fur Shop
550.00
Mink jacket
Maintenance
11/12
1061
Cash
1,105.00
Deposited in
Corn Exchange
Bank personal
Maintenance
account
11/10
5900
B. Altman & Co.
257.55
Furniture
General
Expense
1943
3/ 5
Zinn's Fur Shop
$ 250.00
Silver fox
General
skins
Expense
3/ 5
Geo. Harris, Inc.
130.00
Jewelry
General
Expense
3/12
6979
B. Altman & Co.
106.90
Deposited in
General
account
Expense
5/13
1491
Cash
6,200.00
Jewelry
Factory
Supplies
*198 In March, 1942, Evelyn Lowy, wife of Leo Lowy, arranged for the purchase of a piano from Charles W. Paul, a New York dealer. The purchase price, including tax, was $1,212. The purchase agreement was approved by Lowy. The agreement provided that the piano was to be delivered to the Lowy residence on Riverside Drive. The piano was paid for by a check of the petitioner signed by Lowy. The check stub showed in Lowy's handwriting that the payee of the check was the "Paul Cont. Company." This disbursement was entered in the cash disbursements books as a payment to the "Paul Contracting Company," and was charged to factory maintenance. The bookkeeper who made the entry relied on the information on the check stub in entering the disbursement. In 1942, Evelyn Lowy purchased a mink jacket from Zinn's Fur Shop, New York City. The price was $550 and was paid by petitioner's check signed by Lowy. The check stub for this check indicated, in Lowy's handwriting, that the payee was "Zinn's Machine Company." The bookkeeper who entered this withdrawal in the cash disbursements book charged the item to factory maintenance. In March, 1943, Evelyn Lowy purchased a scarf of two silver fox furs from the *199 same furrier at a cost of $250. The purchase price was paid with a check of the petitioner signed by Lowy. The related check stub was marked "Zinn Fur's" (fur) in Lowy's handwriting and was entered by the bookkeeper in the cash disbursements book as a charge to general expense. In March, 1942, Lowy purchased a diamond and platinum fancy pin from Geo. Harris, Inc., jewelers, for a price of $415. The price was paid with a check of petitioner signed by Lowy. The check stub for this check was marked simply "Harris" and the item was entered in the cash disbursements book under the account "supplies." In March, 1943, Lowy purchased unidentified jewelry from Harris at a cost of $130. Payment therefor was made with a check of petitioner signed by Lowy. The stub showed "Geo. A. Harris, Inc." in Lowy's handwriting and was entered in the cash disbursements book under the heading "General Expense." In May, 1943, Lowy purchased from Harris a four-karat diamond solitaire lady's platinum ring and a five-karat emerald-cut diamond lady's platinum ring at a cost of $6,200. These were paid for by a check of petitioner, drawn to "Cash," signed by Lowy and approved, by endorsement, for cashing by Lowy. *200 [1] The check stub, in Lowy's handwriting, bears the legend "Geo. Harris, Inc., Dies and jigs for job #121214." This disbursement was charged on the books of the petitioner to "factory supplies." In 1942, Rolbal lent the Candida Press $2,588 and, in 1943, $9,721. These loans were made through checks of petitioner signed by Leo L. Lowy. These loans were charged to "printing expense" on Rolbal's books. Periodic repayments were made by Candida during 1942 and 1943. When a group of these repayments on Candida's checks reached $6,600, Lowy returned the checks to Abrahan Broadwin of Candida and requested a single certified check for that amount. Broadwin complied and the check for $6,600 was deposited in Lowy's personal bank account. Rolbal's books never reflected repayment of the loans. In 1942, Rolbal sold scrap metal in the amount of $14,281.47 to the firm of Jakob & Seligmann and Jacob Cohen. In 1943, scrap sales to those firms amounted to $5,079.87. The purchasers paid Lowy personally for the scrap. The payments were deposited in Lowy's *201 personal accounts, or in his wife's accounts. The proceeds from the sale of scrap were never reflected in Rolbal's books nor reported as income. In March, 1942, Evelyn Lowy purchased a six-piece sterling tea set and sterling tray from Joseph Sloves, jewelers, New York City, at a cost of $270. Payment therefor was made with a check of petitioner signed by Leo L. Lowy. The check stub, in Lowy's handwriting, indicates the payee as "J. Sloven." The item was charged to factory supplies on Rolbal's books. Petitioner's returns for all the years in issue were filed with the collector for the first district of New York. In its return for 1941, Rolbal reported a taxable net income of $3,649.30. The Commissioner disallowed deductions in the amount of $26,794.69. Respondent's disallowance was based on his finding that some of the items were capital expenditures and expenses not shown to be ordinary and necessary business expenses. The Commissioner allowed deductions of $4,660.36 for interest and depreciation not claimed by the petitioner in its original return. A deficiency totaling $11,570.64 was determined in income, declared value excess profits, and excess profits taxes. No penalties *202 were determined for 1941. In its return for 1942, Rolbal reported a loss of $365,339.25. The Commissioner disallowed deductions and attributed additional income to Rolbal in the amount of $716,391.29. The Commissioner allowed a deduction of $7,674.30 for depreciation which had not been claimed in the return, and determined that Rolbal had a taxable net income of $343,377.74. The Commissioner determined a deficiency of $283,717.86 for income, declared value excess profits, and excess profits taxes on the basis of his determination of Rolbal's income. Fraud penalties in the amount of $141,858.93 were also asserted for 1942. For 1943, Rolbal reported a loss of $360,434.99 in its return which was filed May 23, 1944. The Commissioner disallowed deductions and attributed additional income to the corporation in the amount of $591,073.87. The Commissioner allowed a deduction of $24,686.20 for depreciation which had not been claimed. He then determined Rolbal's taxable net income for 1943 to be $205,952.68 instead of the reported loss. The Commissioner determined a deficiency for income tax, declared value excess profits tax, and excess profits tax in the amount of $170,149.79 on the above *203 income. Fraud penalties in the amount of $85,074.89 were asserted and the five per cent penalty under section 291(a), in the amount of $8,507.49, was also added. Petitioner's return for the year 1943 was due on March 15, 1944, and it was filed on May 23, 1944, with the collector of internal revenue for the first district of New York. No extension of time for filing had been obtained in advance of the date that the return was due. Part of the deficiencies for the years 1942 and 1943 was due to fraud with intent to evade taxes, and part of the deficiency for 1943 was also due to negligence, or intentional disregard of rules and regulations. Opinion ARUNDELL, Judge: This proceeding reaches us on amended pleadings and presents two basic questions for decision: (1) Is the petitioner entitled to a deduction for depreciation on the machinery and equipment used in the manufacture of its products in the years in issue and, if it is, what amount should it be allowed in each of those years; (2) was any part of the deficiencies in those years attributable to a fraudulent intent to evade taxes, or to negligence? The first question arises because $360,000 was deducted in petitioner's *204 returns for the years 1942 and 1943 as a reasonable rental for the use of machinery claimed to be owned by Leo L. Lowy, its president and sole stockholder. The Commissioner disallowed the deduction and restored the $360,000 in each of the years 1942 and 1943 to the income of the petitioner because the rental was not paid over to or constructively received by Lowy within the periods required by section 24(c) of the Internal Revenue Code. [2] However, shortly before this case was tried, petitioner amended its petition, claiming that it - not Lowy - owned the machinery and equipment it used during the years in issue in its manufacturing process and that it was entitled to depreciation of $360,000 annually on that machinery. *205 Petitioner's case in regard to the ownership of the machinery and equipment it used in its manufacturing process rests on the effect of the transactions which occurred on March 13, 1941, in connection with the loan of $20,000 from Merchants Acceptance Corporation. The respondent contends that these transactions did not effectively transfer ownership of the machinery and equipment to petitioner. Respondent claims that during all the years in issue, Leo Lowy personally owned the machinery and equipment used by the petitioner corporation and, therefore, the petitioner was not entitled to depreciation. On the other hand, petitioner argues that the ownership of the machinery and equipment was effectively transferred from Leo Lowy to petitioner on March 13, 1941, and thereafter, during the years in issue, petitioner was entitled to deduct depreciation on the machinery and equipment. The mechanics of the transactions of March 13, 1941, are set forth completely in our findings of fact and it is unnecessary to repeat them at length. While much is unexplained in Lowy's affairs and his business activities, we do think that Lowy passed legal title and ownership of the machinery and equipment *206 to Rolbal on March 13, 1941, and that title remained in the corporation for the duration of the period here material. Certainly it could not seriously be contested that the transfer would have been considered effective if Rolbal had defaulted on the loan and Merchants Acceptance Corporation had foreclosed the chattel mortgage on the machinery and equipment. In this event, we cannot imagine a Court listening to Lowy contend that he had not transferred the machinery to the corporation to secure the loan. The machinery and equipment were used in Rolbal's production line. Perhaps not all of the machinery was used by Rolbal, and some of it may have been converted or altered for war production use, but much of the machinery appears to have been used by the corporation. We are convinced on the basis of a careful review of this long and sometimes incoherent record that Lowy transferred the machinery and equipment he owned to the petitioner corporation on March 13, 1941. Because we have concluded that the transfer of machinery and equipment was effective, it follows that the petitioner is entitled to a reasonable allowance for depreciation on its machinery and equipment from and after March 13, 1941. The *207 respondent has conceded on brief that, if we concluded that the petitioner had a depreciable interest in the machinery and equipment, the petitioner is entitled to deductions for depreciation, including the amounts previously allowed in the notice of deficiency, not in excess of $87,500 for 1941 and $100,000 for each of the calendar years 1942 and 1943. There appears to be no real disagreement between the parties that the normal useful life of the machinery and equipment is 10 years and that 10 per cent is a fair and reasonable rate of depreciation. We accept respondent's concession as to what is a reasonable allowance for depreciation as a concession that the adjusted basis for the machinery and equipment at the time of the transfer in 1941 was $1,000,000. It is substantially on this basis that we have made our finding above that the machinery and equipment Lowy transferred on March 13, 1941, together with that heretofore owned by Rolbal, had a basis for depreciation of $1,000,000. Subsequent to that date, Rolbal added capital items which it expensed. In reconstructing petitioner's income for the years in issue, the respondent disallowed these capital items as expenses and, in lieu *208 thereof, he allowed deductions for depreciation of these items. We think that these deductions allowed by respondent in determining the deficiencies in this case on account of capital assets added by Rolbal in 1941, 1942 and 1943 should be added to the depreciation at an annual rate of $100,000 on account of the machinery transferred and on hand on March 13, 1941. The above conclusions will call for other adjustments in petitioner's declared value excess profits taxes abd excess profits taxes for the years in issue, but these adjustments can be made by the parties in a computation under Rule 50. Before reaching the foregoing conclusions concerning the allowable depreciation, we gave careful consideration to Lowy's claim that this machinery and equipment largely, if not entirely, purchased before 1930, had a cost of $3,600,000 and that that cost should be the basis for depreciation from and after March 13, 1941. No invoices were submitted to substantiate the original cost; in fact, no purchase records or any other documentary evidence was submitted to substantiate the cost claimed by Lowy, although there was slender corroboration in the testimony of a witness who made a survey of *209 a small sample of the machinery and equipment. And there was nothing but Lowy's testimony to support the claim that, despite the fact that this machinery had been stored unused for 10 years, it suffered no significant obsolescence so that its original cost should still be the basis for depreciation when it was transferred to Rolbal in March, 1941. It has also been suggested that we might reconstruct the basis for depreciation of the machinery in 1941 by subtracting from the amount shown in the machinery account on hand at the time of the trial the known purchases between 1941 and 1949 and the machinery and equipment transferred to Tapered in 1930, but we have concluded that this is too unreliable and uncertain a procedure. Therefore, considering all the factors involved in determining a basis for computing a fair and reasonable allowance for depreciation, we conclude that the best we can do is to accept the respondent's concession, as a starting point, and add to it the allowances made in his reconstruction of the petitioner's income on account of the capital additions acquired in 1941, 1942 and 1943. On the second basic issue, we conclude that unquestionably there has been fraud *210 in the reporting of petitioner's income for the years 1942 and 1943. In each of those two years, a substantial amount of petitioner's income was diverted to Lowy personally without passing through the petitioner, and substantial personal expenses of Lowy were paid for by the petitioner under the guise of legitimate expenditures for corporate purposes. We think that the respondent has clearly sustained his burden in proving the fraud charges. Petitioner has offered no contrary evidence of substance. Some contention was made that the accountants had erroneously entered Lowy's personal expenses as corporate expenditures and, had they been more diligent, the expenses would not have been charged off to the corporation. We do not think that Lowy can shield himself behind his accountants. For example, they knew nothing about the sales of petitioner's scrap metal from the corporate records. Payments for the scrap were made directly to Lowy and deposited in his personal accounts or in joint accounts with his wife. The payments were never reported as income. It is difficult to find a more perfect example of concealment of income. Lowy handled the entire transaction. He testified that he spent *211 substantial amounts of his own money for legitimate corporate expenditures and he was merely reimbursing himself for these expenditures with the income from the scrap sales. However, we have only his testimony to support this claim. No invoices or vouchers were presented which would support his claim. When Lowy used corporate funds to meet personal expenditures, he made out the checks and check stubs himself. In the instance where he purchased two diamond rings at a total cost of $6,200 and marked the stub "Dies and jigs for job #121214," the accountant appropriately entered the disbursement under a corporate expense account. There was no negligence in the accountant's reliance on such a clearly detailed expenditure. Similarly, when Lowy made out a check to a furrier and marked the stub " Machine Company," or the payment for a piano for his apartment as " Cont. Company," the accountant and bookkeeper were hardly negligent in treating the expenditures as legitimate corporate expenses. Against these damaging facts, we have only Lowy's testimony that he was spending heavily from his own funds for corporate expenses and reimbursing himself by charging personal items to the corporation. *212 But we have no evidence to support his testimony and, in the circumstances, his bare word is not enough to upset the permissible inferences which we draw from the long series of substantial corporate disbursements which were made for Lowy's personal expenses and disguised by him as proper corporate expenses. Finally, with respect to the return for 1943, we conclude that there was no satisfactory explanation for the failure to file the return on time and the negligence penalty has been properly added by the respondent to the deficiency for this year. All other issues raised by the notice of deficiency and challenged by petitioner have been abandoned or conceded by the petitioner. One matter deserves comment, however. In petitioner's amended and supplemental petition, it is charged that it would be error for the respondent to assess interest on the deficiencies and the penalties from the dates when the taxes for the years in issue here were due. Petitioner claims that the respondent has willfully delayed the trial of this cause since 1946 so that now the interest chargeable to petitioner amounts to a very significant part of the total due from the petitioner. It is argued that it *213 is unfair to permit interest to build up through the delay of the respondent. Petitioner apparently would have us eliminate, or at least abate, the interest on the deficiencies and penalties. The short answer to petitioner's request is that it is now a settled proposition that this Court has no jurisdiction to order any adjustment in interest on a deficiency except insofar as our redetermination of the deficiency itself might affect the ultimate basis on which interest is computed. Commissioner v. Kilpatrick's Estate (C.A. 6) 140 Fed. (2d) 887; Gussie P. Chapman, 14 T.C. 943, affirmed per curiam (C.A. 9) 191 Fed. (2d) 816. Decision will be entered under Rule 50. Footnotes
1. Petitioner's check for $6,200, payable to "Geo. Harris, Inc." was originally drawn for payment, but this was not acceptable to the jeweler.↩
2. SEC. 24. ITEMS NOT DEDUCTIBLE. * * * (c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued - (1) If such expenses or interests are not paid within the taxable year or within two and one half months after the close thereof; and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24(b)↩.